Filed 10/16/13  P. v. Avalos CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANGEL AVALOS,<br><br>　　　Defendant and Appellant. | B240194<br><br>(Los Angeles County<br>Super. Ct. No. BA361451) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Mitchell, Judge.  Affirmed.

　　　Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Supervising Deputy Attorney General, William H. Shin, Deputy Attorney General, for Plaintiff and Respondent.

_____

Angel Avalos was convicted by a jury of conspiracy to commit assault with a deadly weapon and assault with a deadly weapon with true findings on special allegations both crimes had been committed for the benefit of a criminal street gang. On appeal Avalos contends the court erred in denying his pretrial motion to dismiss the case because law enforcement had failed to preserve potentially exculpatory evidence. He also challenges the court's evidentiary rulings and contends his convictions are not supported by substantial evidence. Finally, he contends he was deprived of his statutory right to have the jury determine the truth of a specially alleged prior conviction allegation. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

In an amended information filed December 16, 2011 Avalos was charged, along with codefendants Jennifer Barela, Jose Paredes, Valentin Magallanes and Jorge Aguirre, with one count of conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1))[1] and one count of attempted murder (§§ 187, subd. (a), 664). The amended information also specially alleged both offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members. In addition, it was specially alleged Avalos had suffered a prior serious or violent felony conviction under the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Avalos pleaded not guilty and denied the special allegations. His motion to sever his trial from that of his codefendants was granted.

2. *The Evidence at Trial*

Harold Cruz had been incarcerated at the Los Angeles County jail since 2005 awaiting trial on a murder charge. While he was in jail, Cruz was recruited by the

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

2

Mexican Mafia[2] to be a shot caller on the 3000 floor where he was housed. Paredes, a Southside gang member incarcerated on the same floor as Avalos, instructed Cruz on what tasks to perform on behalf of the Mexican Mafia. After two drug smuggling operations involving Cruz fell apart in early June 2007 when the drugs failed to get to their planned destination, Cruz was targeted by Paredes and the Mexican Mafia to receive "hard candy," a phrase Rene Enriquez, a former member of the Mexican Mafia, testified meant targeted for killing.

On June 15, 2007 Cruz was stabbed in the arm and beaten by more than 10 prisoners while he was playing handball in the jail's exercise yard. Later that night Magallanes, a Southside gang member housed near Cruz in the jail, telephoned Barela, a secretary in the Mexican Mafia,[3] to inform her he was on Cruz's floor. Barela told Magallanes the "hit" on Cruz was supposed to have been "hard candy" and instructed him that Cruz should be "hit again."

---

[2] The Mexican Mafia is an organized crime syndicate involved in a variety of violent and drug-trafficking activities throughout the United States, including criminal activity within the Los Angeles County jail and California's prison systems. According to Rene Enriquez, a former Mexican Mafia member who testified in this case, nearly every member of a Hispanic criminal street gang who enters jail or prison in southern California becomes a member of "the Southside," a Hispanic criminal street gang that serves as foot soldiers for the Mexican Mafia. Southside members are instructed when they arrive in jail to put aside their former gang allegiances and rivalries in favor of service to the Mexican Mafia. Comprised of only 150 to 200 members nationwide, but serviced by thousands of Hispanic criminal street gang members, the Mexican Mafia makes its money within the Los Angeles County jail in several ways: It sells drugs to prisoners in the jail; it receives a "tax" of one third of all drugs that are brought into the system; and it collects, via extortion activities, a portion of the funds that prisoners spend in the commissaries.

[3] According to Enriquez, a "secretary" for the Mexican Mafia is a nonincarcerated individual who facilitates the activities of the organization. The individual "receives calls typically on burn-out lines, phones established through identity theft . . . and numerous individuals can call her from a specific facility [(jail)] and she runs the communication for that specific area. . . . She fields all communications sometimes for the facility. These individuals then pass on the information to the hierarchy, which are the Mexican Mafia members, the shot callers or *Meseros*, for the organization."

After speaking with Barela, Magallanes told Avalos, "We got to hit him [(Cruz)] again." Avalos complained he did "not have anything" to accomplish the hit, but said he would look for something. During pill call later that evening,[4] Cruz left his cell to obtain a new shirt to replace the one bloodied in the fight earlier that day. While Cruz was in the laundry room, somebody came up behind him and sliced his face with a razor blade embedded in a toothbrush, causing a seven-inch-long gash on Cruz's face that exposed his jaw bone and gum line and required 27 stitches. Cruz immediately grabbed his face and turned around to see Avalos and Aguirre. Avalos acted very aggressively toward Cruz, taunting him and trying to prevent him from running away. Cruz did not see a weapon in either man's hands. Cruz immediately ran out of the laundry room. The weapon was later found in a milk carton in the laundry room. The People presented evidence Avalos had no reason to be in the laundry room or out of his cell for pill call since he was not on the list of prisoners taking prescribed medicine.

Enriquez opined the stabbing of Cruz was committed at the direction of, for the benefit of, or in association with the Southside gang and the Mexican Mafia with the specific intent to further, promote or assist both gangs in their criminal activities. He explained the stabbing enhanced the terror reign of both the Southside gang and the Mexican Mafia within the jail.

Avalos did not testify. His theory at trial was that Aguirre had stabbed Cruz and he had had nothing to do with it. He presented a recording of a telephone conversation between Paredes and Aguirre on July 13, 2011 in which Aguirre told Paredes Avalos had lied about having stabbed Cruz. Although Avalos was supposed to have been the one to attack Cruz, Avalos would not, or could not, follow through on the mission, forcing Aguirre to carry out the attack on Cruz in the laundry room.

---

[4] Pill call is the jail procedure for distributing prescribed medications to inmates. The module officer announces the pill call and manually opens the cells. Inmates who are to receive medication step out of their cells, walk down the row toward the nursing station in the laundry room and line up to obtain their medication. The inmates are not handcuffed during pill call.

4

3. *The Verdict and Sentence*

The jury was instructed on theories of conspiracy, attempted murder and aiding and abetting, as well as the lesser included offense of assault with a deadly weapon. It convicted Avalos of conspiracy to commit assault with a deadly weapon and assault with a deadly weapon. The jury also found the gang allegations true.

In a bifurcated proceeding on the prior strike allegation, Avalos waived his right to a jury trial. After the jury was discharged, over Avalos's objection the court granted the People's request to amend the information to allege the same prior conviction that constituted a strike also constituted a serious felony within the meaning of section 667, subdivision (a)(1).

The trial court found the prior conviction allegations true and sentenced Avalos to an aggregate state prison term of 18 years: the high term of four years for conspiracy to commit assault with a deadly weapon, doubled under the three strikes law, plus five years for the gang enhancement and five years for the serious felony enhancement. Sentence on the aggravated assault offense was stayed under section 654.

## DISCUSSION

1. *The Trial Court Did Not Err in Denying Avalos's Motion To Dismiss for Failure To Preserve Evidence*

a. *Relevant proceedings*

Prior to trial Avalos moved to dismiss the case against him, arguing the Los Angeles County Sheriff's Department (LASD) had deliberately, and in bad faith, destroyed the weapon used to attack Cruz. Avalos argued the weapon was exculpatory because, had it been subjected to DNA testing, it would have demonstrated Aguirre had stabbed Cruz, not Avalos.

The trial court held an evidentiary hearing to determine the circumstances surrounding LASD's failure to preserve the weapon. According to the evidence presented at that hearing, Avalos's counsel contacted Detective Francis Hardiman, the lead investigator on the case, in November 2010 requesting the weapon be produced for DNA testing. Hardiman immediately confirmed with the central property division that

5

the weapon was still in the custody of LASD and informed Avalos's counsel of that fact. No DNA testing had been conducted.

On December 21, 2010 Avalos's counsel reported to Detective Hardiman he had been unable to retrieve the weapon from LASD because it had been destroyed. Hardiman was surprised because under LASD policy only the lead investigator can order evidence destroyed and he made no such order. In fact, he testified, in accordance with LASD policy on retention of evidence, the retention number on the evidence indicated it was to be retained.

Detective Hardiman immediately conducted an internal investigation. He learned the central property division, where the weapon had been stored, did not have him listed as the lead investigator. According to Hardiman, several years had passed between the attack on Cruz and the filing of charges against Avalos. During this interim period the case had been assigned to the jail investigations unit of LASD. By mistake, that designation remained in the computer system even after Avalos and his codefendants were charged and the case reassigned to Hardiman in the major crimes bureau gangs division of LASD. As a result, when a routine evidentiary report from the central property division circulated sometime in November or December 2010 requesting directions on what to do with the evidence, it did not go to Hardiman but to another investigator in the jail investigations unit. When that investigator consulted the computer system and found, erroneously, the case had been "inactive" for several years, he "signed off to have it destroyed."

The court denied Avalos's motion to dismiss the charges against him. It determined the weapon was, at best, only potentially exculpatory as it had not been subject to DNA analysis by any one. Although the court found there was "a real failure [by] the Sheriff's Department to comply with their internal policy of requiring prior to the destruction of evidence a sign-off by the investigating officer," it concluded the evidence had not been destroyed in bad faith. The court permitted Avalos to argue to the jury that,

6

had the weapon been preserved and subjected to DNA analysis, it would have shown Aguirre had stabbed Cruz.[5]

b. *Governing law and standard of review*

The due process clause of the Fourteenth Amendment requires state law enforcement agencies to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 81 L.Ed.2d 413] (*Trombetta*); *People v. Zapien* (1993) 4 Cal.4th 929, 964 (*Zapien*).) "'To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."'" (*People v. Catlin* (2001) 26 Cal.4th 81, 159-160.) Although the state's good or bad faith in failing to preserve evidence is ordinarily irrelevant to assessing whether its conduct amounted to a due process violation (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281] (*Youngblood*)), it is of great significance when the challenge to the state's conduct is based on the failure to preserve potentially exculpatory evidence—that is, "evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant." (*Ibid.*) In that case, "'"unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."'" (*Catlin*, at p. 160, quoting *Youngblood*, at p. 58; *People v. DePriest* (2007) 42 Cal.4th 1, 41-42 [same]; see also *People v. Cooper* (1991) 53 Cal.3d 771, 810-811 [adopting the standard set forth in *Trombetta* and *Youngblood* to evaluate due process challenge under state law].)

"The presence or absence of bad faith by the police for purposes of the Due Process Clause . . . necessarily turn[s] on the police's knowledge of the exculpatory value

---

[5] The absence of Avalos's DNA on the weapon, of course, does nothing to disprove his participation in the conspiracy to attack Cruz or his involvement as an aider and abettor in the aggravated assault.

7

of the evidence at the time it was lost or destroyed." (*Youngblood*, *supra*, 488 U.S. at pp. 56-57, fn. *; accord, *People v. DePriest, supra,* 42 Cal.4th at pp. 42-43.) Of paramount significance is whether the state knew the evidence could form a basis for exonerating the defendant and failed to preserve it as part of a conscious effort to circumvent its constitutional discovery obligation. (*Trombetta, supra,* 467 U.S. at p. 488; *Zapien, supra*, 4 Cal.4th at p. 964.) Negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood*, at p. 58; *DePriest,* at p. 43.)

The trial court's finding following a factual inquiry as to whether the evidence was destroyed in bad faith is reviewed for substantial evidence. (*People v. Roybal* (1998) 19 Cal.4th 481, 509; *People v. Memro* (1995) 11 Cal.4th 786, 831.)

### c. *Substantial evidence supports the court's finding the evidence was not destroyed in bad faith*

Avalos does not dispute the missing weapon was only potentially exculpatory because no tests had been conducted as to the presence or absence of his DNA. Rather, he contends, as he did in the trial court, evidence the weapon was destroyed in bad faith is reflected in the timing of its destruction: It had been in LASD custody for three and one-half years and was destroyed only after he had requested it for DNA testing. While Avalos's inference is not unreasonable, the court rejected it, finding credible Detective Hardiman's testimony that the weapon had been inadvertently destroyed. That testimony, reasonable, credible and of solid value, adequately supports the court's finding.

### 2. *The Trial Court Did Not Err in Admitting Evidence of Avalos's Uncharged Possession Offense*

#### a. *Relevant proceedings*

Prior to trial the People moved to introduce evidence that in October 2009, more than two years after the aggravated assault on Cruz, sheriff's deputies at the jail where Avalos was housed discovered large quantities of heroin, cocaine and marijuana on Avalos's person and in his cell. They also discovered, during a raid on Avalos's cell in July 2011, several gang-related documents. As to the 2009 incident, the People argued

8

the evidence was relevant because it showed Avalos's continuing and increasing responsibilities to the Southsider gang and the Mexican Mafia following the aggravated assault: Avalos would never have been entrusted with such a large quantity of drugs had he been unsuccessful in carrying out the Mexican Mafia's earlier command to attack Cruz. The court denied the motion explaining, without supportive evidence from gang experts showing a nexus between the 2007 aggravated assault and the 2009 incident, the evidence was more prejudicial than probative and properly excluded under Evidence Code section 352. The court also refused to allow introduction of the 2011 gang-related documents under Evidence Code section 352.

During trial gang expert Enriquez testified gang members in the jail rose through the ranks and achieved greater respect by working for the Mexican Mafia, often volunteering for violent tasks to show commitment to the gang. Enriquez opined the jailhouse assault on Cruz would have elevated Avalos's status in the gang. He also opined, had a person refused to carry out an order from the Mexican Mafia, he would lose status and would no longer be trusted with the responsibility of smuggling a large quantity of drugs in the jail.

Following Enriquez's testimony the People renewed their motion to introduce the evidence of Avalos's 2009 and 2011 conduct, arguing it contradicted Avalos's defense theory that he had refused to carry out the Mexican Mafia's mandate to attack Cruz. Based on the nexus between the two incidents provided by Enriquez's testimony, the court concluded the 2009 evidence of possession was more probative than prejudicial and admitted it into evidence. The court did not reverse its prior ruling on the 2011 discovery of gang-related documents, finding that evidence inadmissible under Evidence Code section 352.

b. *Governing law and standard of review*

Evidence Code section 1101, subdivision (a), "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Subdivision (b) of the section clarifies,

9

however, this rule "does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ibid.*; see Evid. Code, § 1101, subd. (b) ["[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his or her disposition to commit such an act"].) Ultimately, "'[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence,'" including whether the evidence is more prejudicial than probative and thus subject to exclusion under Evidence Code section 352. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22; *People v. Edwards* (2013) 57 Cal.4th 658, 711.)

The trial court's determinations concerning the admissibility of uncharged crimes evidence under Evidence Code sections 1101 and 352 are reviewed for abuse of discretion. (*People v. Edwards, supra,* 57 Cal.4th at pp. 711, 713; *People v. Kipp* (1998) 18 Cal.4th 349, 369.) The court's ruling "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in an a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; accord, *People v. Jordan* (1986) 42 Cal.3d 308, 316.)

> c. *The trial court did not abuse its discretion in admitting evidence of Avalos's possession of drugs in 2009*

Avalos contends evidence of his possession of drugs in 2009 is so wholly dissimilar to the charged offense of conspiracy to commit murder and attempted murder that it was inadmissible under Evidence Code section 1101, subdivision (b). (See, e.g. *People v. Kipp, supra,* 18 Cal.4th at p. 369 ["[e]vidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent"]; *People v. Jones* (2011) 51 Cal.4th 346, 371.) Avalos's emphasis on the lack of similarity between the charged and uncharged offenses

10

is misplaced.  By its terms, Evidence Code section 1101, subdivision (b), permits specific instances of conduct to be admitted into evidence when relevant to prove some fact other than the defendant's propensity to commit a crime.  Here, Avalos's act of smuggling drugs in 2009 in the jail, combined with expert testimony that Avalos would not have been entrusted with such a large quantity of drugs if he had disregarded the Mexican Mafia's prior instructions to target Cruz for attack, was not offered to show a propensity to attack Cruz, but to cast doubt on his defense that he refused to carry out the Mexican Mafia's instructions.  It was admissible under Evidence Code section 1101, subdivision (b), whether or not it was similar to the charged offense.  (See *People v. Peete* (1946) 28 Cal.2d 306, 314-315 ["It is settled in this state, however, that except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.  'The general tests of the admissibility of evidence in a criminal case are:  . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense?  If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.'"]; *People v. Daniels* (1991) 52 Cal.3d 815, 856 [admitting evidence of prior robbery in which defendant was shot while fleeing to establish motive for subsequent murder of police officers; "[a]s long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper"].)[6]

_____

[6]     To the extent there is language in opinions, including from the Supreme Court, suggesting the charged and uncharged crimes must be similar (see, e.g., *People v. Jones, supra,* 51 Cal.4th at p. 371; *People v. Stitely* (2005) 35 Cal.4th 514, 532), those cases address situations in which the uncharged offense has been introduced to prove knowledge, intent, identity or modus operandi, instances in which some degree of similarity is necessary for the evidence of the uncharged offense to be relevant.  Here, as explained, the evidence of Avalos's uncharged drug offense is probative to impeach his claim he had disobeyed an earlier Mexican Mafia order.  The relevance of the evidence did not depend on its similarity to the crimes charged.  (See *People v. Daniels, supra,* 52 Cal.3d at p. 857.)

With respect to Evidence Code section 352, the court carefully considered the potential for prejudice if the 2009 evidence was admitted and ultimately found that evidence, unlike the 2011 conduct, more probative than prejudicial. That determination, neither arbitrary nor capricious, was plainly within the trial court's broad discretion.

3. *Avalos's Convictions for Conspiracy To Commit Assault with a Deadly Weapon and Assault with a Deadly Weapon Are Supported by Substantial Evidence*

In addressing a challenge to the sufficiency of the evidence to support a verdict, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict— i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Avalos contends the evidence is insufficient to support his convictions for conspiracy to commit aggravated assault and aggravated assault[7] because there was "very

---

[7]     Conspiracy, a crime distinct from its target offense, occurs when two or more individuals have the specific intent to agree to commit a crime coupled with the specific intent to commit the elements of the target crime and one or more of the parties commits an overt act in furtherance of the agreement. (§ 182, subd. (a)(1); *People v. Morante*

12

limited" evidence he was involved in the attack. He emphasizes Cruz did not see a weapon in Avalos's hand immediately following the stabbing and Aguirre had boasted to Paredes he had stabbed Cruz because Avalos had been either unable or unwilling to carry out the attack. However, there was also evidence Magallanes and Avalos had discussed a planned assault on Cruz; Avalos told Magallanes during that conversation he would try to locate a weapon in order to carry out the planned attack; Avalos was one of two men Cruz saw when the assault occurred; he acted very aggressively toward Cruz immediately after the assault when Cruz attempted to flee; and Avalos's status with the Southside gang and the Mexican Mafia increased following the stabbing. The People argued, and the jury found, whether or not Avalos was the actual perpetrator of the attack, he was involved in the conspiracy and, at the very least, aided and abetted the aggravated assault. Resolving all conflicting inferences in favor of the judgment, as we must, the jury's findings are amply supported by the record. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560; *People v. Mitchell* (1986) 183 Cal.App.3d 325, 329 ["[w]hether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment"].)

4. *Any Error in Permitting the Information To Be Amended After the Jury Was Discharged Was Harmless*

Section 969a permits an information to be amended to charge a prior conviction enhancement "[w]henever it shall be discovered that a pending indictment or information does not charge all prior felonies of which the defendant has been convicted either in this State or elsewhere . . . ." Section 1025, subdivision (b), requires the same jury that

---

(1999) 20 Cal.4th 403, 416 & fn. 3.) Assault with a deadly weapon is an assault—an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another (§ 240)—with a deadly weapon or instrument other than a firearm (§ 245, subd. (a)(1)). Aiding and abetting occurs when an individual acts with knowledge of the criminal purpose of the perpetrator and with an intent or purpose of committing, facilitating or encouraging commission of the crime (*People v. Delgado* (2013) 56 Cal.4th 480, 486) and can be inferred from a variety of factors including presence at the scene of the crime and conduct before and after the offense. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

decided the defendant's guilt to decide whether or not the defendant suffered the prior conviction unless the defendant waives his or her right to a jury for this purpose.[8] (See *People v. Tindall* (2000) 24 Cal.4th 767, 782 (*Tindall*) ["in the absence of a defendant's forfeiture or waiver, section 1025, subdivision (b) requires that the same jury that decided the issue of a defendant's guilt 'shall' also determine the truth of alleged prior convictions"].)

In *Tindall* the Supreme Court addressed the potential conflict between a defendant's statutory right under section 1025, subdivision (b), to have the same jury decide his or her guilt and the truth of the prior conviction allegations, and the court's apparently unlimited authority under section 969a to allow the People to amend the information to add a previously uncharged prior conviction. Reconciling the statutes, the Court found that the section 969a right to amend the information exists up to the time the jury is discharged and not beyond: "Because a jury cannot determine the truth of the prior conviction allegations once it has been discharged [citation], it follows that the information may not be amended to add prior conviction allegations after the jury has been discharged." (*Tindall, supra,* 24 Cal.4th at p. 782.)

Avalos contends the court violated section 1025, subdivision (b), in permitting the People to amend the information after the jury was discharged. The People, on the other hand, insist there was no violation of section 1025 because Avalos had waived his right to a jury trial on the qualifying strike conviction that served as the basis for the new section 667, subdivision (a), enhancement. The People assert Avalos's waiver of his statutory rights under section 1025 necessarily extended to any new theory on which that

---

[8]     Section 1025, subdivision (b), provides, "Except as provided in subdivision (c), the question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue upon the plea of not guilty, or in the case of a plea of guilty or nolo contendere, by a jury impaneled for that purpose, or by the court if a jury is waived." Subdivision (c) of that section limits that statutory right to matters other than the question of the identity of the defendant. (See § 1025, subd. (c) ["[n]otwithstanding the provisions of subdivision (b), the question of whether the defendant is the person who has suffered the prior conviction shall be tried by the court without a jury"].)

conviction, already alleged, served as the basis for an enhanced sentence. (Cf. *Tindall, supra,* 24 Cal.4th at p. 776 [trial court acted in excess of its jurisdiction when it permitted amendment of information to add new prior conviction allegations after the jury was discharged]; *People v. Gutierrez* (2001) 93 Cal.App.4th 15, 24 [defendant's waiver of jury trial extended only to those prior convictions alleged at time of waiver and not to those not alleged].)

While the present circumstance is distinguishable from *Tindall* and *Gutierrez* where different prior convictions were added as enhancements after the jury had been discharged, we are troubled by the People's contention a defendant's waiver necessarily includes additional sentence enhancements, even though based on the same prior conviction, that were not alleged at the time the waiver was taken. A defendant can hardly be said to have made an informed waiver of a right to a jury trial regarding an enhancement allegation—one that in this case increased his sentence by five years, even more than the prior strike allegation—when that theory for the additional enhanced sentence had not yet been alleged. (See *United States v. Olano* (1993) 507 U.S. 725, 733 [113 S.Ct. 1770, 123 L.Ed.2d 508 [waiver is the voluntarily relinquishment of a *known* right]; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 521; *In re Hannie* (1970) 3 Cal.3d 520, 526-527 [to be valid, a waiver of a statutory right must be knowing, intelligent and voluntary].**)**

Nonetheless, the section 1025 right to have the same jury that decided a defendant's guilt determine the truth of the prior conviction allegation is based on statute, not the federal or California Constitution. (See *People v. Epps* (2001) 25 Cal.4th 19, 22 ["[t]he right, if any, to a jury trial of prior conviction allegations derives from section 1025 and 1158, not from the state or federal Constitution"]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 496 [constitutional right to have jury determine truth of any fact that increases defendant's sentence beyond statutory maximum does not apply to fact of prior conviction].) Accordingly, if there were error, reversal would only be required if there was a reasonable probability Avalos would have obtained a more favorable result had the jury that decided his guilt also determined the truth of his alleged prior conviction

15

for the purpose of section 667, subdivision (a). (*Epps,* at p. 29 [deprivation of defendant's right to jury trial on prior conviction sentencing enhancement in accordance with § 1025 is neither structural nor constitutional error, but simply a violation of state law; accordingly, it is reviewed for prejudice under standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

In this case any error in permitting the amendment was plainly harmless. The record is clear, and Avalos does not argue otherwise, that he suffered a prior conviction on March 23, 2005 for shooting at an occupied motor vehicle, a serious felony under both the three strikes law and section 667, subdivision (a). Under the circumstances it is not reasonably probable that, absent the error, Avalos would have received a more favorable result.

**DISPOSITION**

The judgment is affirmed.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.

16